UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br>　v.<br><br>DAVID JAMES MICHAEL JENSEN,<br><br>　　　　　Defendant. | CASE NO. 2:24-cr-00204-TL-1<br><br>ORDER ON MOTION TO SUPPRESS |

This matter is before the Court on Defendant David James Michael Jensen's Motion to Suppress. Dkt. No. 40. Having reviewed and considered the Government's Response (Dkt. No. 48), Mr. Jensen's Reply (Dkt. No. 50), and the relevant record, and having heard oral argument, the Court GRANTS Mr. Jensen's motion.

I.     BACKGROUND

The following summary comes from the Parties' briefing and attached exhibits.

On May 11, 2022, Officer Sinex[1] of the Everett Police Department saw a vehicle he

---

[1] Officer Sinex's first name is not contained in the record before the Court.

ORDER ON MOTION TO SUPPRESS – 1

1  believed belonged to David Jensen drive into the parking lot of The Reserve apartment complex
2  in Everett, Washington. Dkt. No. 48-1 at 1. The vehicle was a two-door red Lincoln with black
3  rims and tinted windows. *Id*. Officer Sinex notified his colleague, Officer Brandon Hoelzel, that
4  he believed David Jensen had driven the vehicle into the parking lot. *Id*. Police conducted a
5  record check of the license plate, Washington plate BJB7985, which showed the vehicle had
6  recently been sold to Mr. Jensen. *Id*. At that time, Officer Hoelzel knew that there was probable
7  cause, related to a prior incident, to arrest Mr. Jensen on two counts of Unlawful Possession of a
8  Firearm in the 1st Degree, Possession of a Stolen Firearm, and three counts of Possession of a
9  Controlled Substance with Intent to Distribute. *Id*.

Officer Hoelzel drove to The Reserve's parking lot in an unmarked police vehicle. *Id*. He parked and watched as Mr. Jensen stood at the back of the Lincoln vehicle, reaching into the trunk and putting items into a grey backpack. *Id*. The Lincoln was parked next to a pickup truck. *Id*. The pickup truck was occupied by a man police later identified as Darren Olsen. *Id*. Officer Hoelzel directed Department of Corrections ("DOC") Officer Louis Mahre and Sergeant Chris Bennett to go to the parking lot to contact Mr. Jensen. *Id*.

Moments after Officer Hoelzel reported Mr. Jensen's presence, Sgt. Bennett and Officer Mahre arrived at the parking lot. *Id*. Sgt. Bennett activated his emergency lights and pulled up to the Lincoln and the truck. *Id*. Officer Hoelzel watched the encounter from afar in his unmarked patrol vehicle. *Id*. Shortly before police contacted Mr. Jensen, Officer Hoelzel saw Mr. Jensen retrieve a small black pouch[2] from the trunk of the Lincoln. *Id*. Officer Hoelzel then watched Sgt. Bennett and Officer Mahre arrive on scene and approach Mr. Jensen. *Id*. Officer Hoelzel

---

[2] The briefings all refer to a black pouch, where the police reports refer to a black case. In any event, there does not seem to be any dispute as to the black pouch or case in question. The Court will refer to it as the black pouch as that is the term the Parties use in their briefing.

ORDER ON MOTION TO SUPPRESS – 2

saw Mr. Jensen notice the police, do a "stutter step," and then reach into the passenger side of Mr. Olsen's truck while holding the black pouch. *Id*. After reaching into the truck, Mr. Jensen came back out without the pouch in his hand, and was subsequently arrested by Officer Mahre.[3] *Id*. at 2. Officer Mahre handcuffed Mr. Jensen and walked him to the patrol car. Dkt. No. 48-2 at 2. Officer Mahre searched Mr. Jensen's person, incident to arrest, and found a "large amount" of loose currency in many denominations. *Id*. After the search, Officer Mahre put Mr. Jensen in the back of the patrol car. *Id*.

A few minutes after Mr. Jensen was arrested, Sgt. Bennett went to Mr. Olsen's vehicle to speak with Mr. Olsen. Dkt. No. 48-3 at 3. Mr. Olsen told Sgt. Bennett that he lived at The Reserve and had known Mr. Jensen for a few years. *Id*. He said he had met Mr. Jensen in the parking lot that day to buy heroin. *Id*. While standing outside of the vehicle, Sgt. Bennett saw a small black pouch on the passenger's seat and a scale on the passenger's floorboard. *Id*. Mr. Olsen said he did not know what the pouch was and that the pouch and scale belonged to Mr. Jensen. *Id*. Sgt. Bennett gave Mr. Olsen *Ferrier*[4] warnings and Mr. Olsen gave consent to have his vehicle searched. *Id*.

During the search of the vehicle, Sgt. Bennett confiscated the pouch and the scale. *Id*. Additionally, on the front dashboard above the steering wheel, Sgt. Bennett found a receipt with the name "David" written on it. *Id*. The receipt also had a phone number on it. *Id*. Officer Mahre

---

[3] Officer Hoelzel's report indicates he watched Mr. Jensen reach into the truck with the black pouch and lean back out of the truck without the pouch. Dkt. No. 48-1 at 2–3. The Government stated in its response brief that the Body Worn Video ("BWV") of the arresting officers, Sgt. Bennett and Officer Mahre, did not capture Mr. Jensen's response to police arrival, indicating the BWV did not capture Mr. Jensen putting the pouch in the car. Dkt. No. 48 at 3. Officer Mahre's report states he asked Officer Hoelzel if Mr. Jensen was holding the black pouch at any point, indicating he did not see Mr. Jensen holding the pouch himself. Dkt. No. 48-2 at 1. Sgt. Bennet's report does not mention that he witnessed Mr. Jensen holding the black pouch and putting it into Mr. Olsen's truck. Dkt. No. 48-3.

[4] "*Ferrier*" warnings refer to Washington State Supreme Court case *State v. Ferrier*, in which the Court held that when police conduct a knock-and-talk procedure, they must advise the person whose home they want to search that they have the right to refuse consent. 136 Wn.2d 103, 115, 960 P.2d 927 (1998).

called that number and the cell phone in the center console of Mr. Jensen's vehicle lit up, showing it received a call from Officer Mahre's number. *Id*.

Moments later, Sgt. Bennett took a voluntary written statement from Mr. Olsen. *Id*. at 4. Mr. Olsen stated that he planned to buy $20 worth of heroin from Mr. Jensen, but that before the transaction could be made, police arrived. *Id*. Further, Mr. Olsen stated that when police arrived, Mr. Jensen walked up to his passenger door, yelled "cops," and put his belongings in Mr. Olsen's vehicle. *Id*. Officers read Mr. Jensen *Miranda* warnings and attempted to speak with him, but he asserted his right to an attorney. Dkt. No. 48-1 at 3. However, Mr. Jensen now admits that the pouch was his. Dkt. No. 51 ¶ 5.

About 20 minutes after arresting Mr. Jensen and putting him in the back of the patrol car, Sgt. Bennett unzipped the black pouch, sifted through it, and photographed the items found. Dkt. No. 40 at 2. Inside the bag were a black cylindrical container and drug paraphernalia. Dkt. No. 48-3 at 4. Sgt. Bennett reported that the cylindrical container had a dark, sticky residue on the outside of it and, based on his training and experience, it smelled like heroin. *Id*. The container was locked; therefore, Sgt. Bennett could not see the contents within the container and ended his search.[5] *Id*.

Shortly after the search of the pouch, Marysville Police Department Officer Smith[6] arrived on scene with a K9. *Id*. The K9 sniffed Mr. Jensen's vehicle and advised the officer of a positive alert for contraband within the vehicle. *Id*. The vehicle and evidence were impounded by police. *Id*.

//

//

---

[5] The key to unlock the container was attached to a key ring that was attached to the ignition key which was located in Mr. Jensen's car (and, therefore, not provided to Mr. Olsen). Dkt. No. 48-1 at 8.

[6] Officer Smith's first name is not contained in the record before the Court.

ORDER ON MOTION TO SUPPRESS – 4

The next day, May 12, 2022, Officer Hoelzel submitted a search warrant application for the cylindrical container and Mr. Jensen's vehicle to a Snohomish County Superior Court Judge. Dkt. No. 48 at 3. The search warrant was issued. *Id*. Inside the cylindrical container, police found 15 grams of heroin and 5 grams of methamphetamine. *Id*. at 4. Inside the Lincoln vehicle, police found a Hi-Point Model C9 9-millimeter pistol with one round in the chamber and rounds in the magazine. *Id*. at 4.

The Government clarified at oral argument that it is not asserting that the search of the pouch was a lawful search incident to arrest. Additionally, the Government clarified that it was arguing that the good-faith exception applied to the search of the cylindrical container within the pouch, not to the search of the pouch itself, which hinges on the Government's assertion of abandonment. In other words, if the Court rules the pouch was not abandoned, the search of the cylindrical container was nevertheless searched in good faith on an approved search warrant.

## II. Legal Standard

### A. Fourth Amendment and Privacy Interest

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When law enforcement conducts a search to discover evidence, "reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 383 (2014) (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)). Without a warrant, a search is only allowed if it falls within one of the exceptions to the warrant requirement. *Id*.

To have standing to seek suppression of the fruits of an officer search, a defendant must show that they had a "a property interest protected by the Fourth Amendment that was interfered with . . . , or a reasonable expectation of privacy that was invaded by the search thereof." *United States v. Padilla*, 508 U.S. 77, 82 (1993). A reasonable expectation of privacy depends on two elements: "(1) whether the person had 'an actual (subjective) expectation of privacy,' and (2) whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable."'" *United States v. Lopez-Cruz*, 730 F.3d 803, 807 (9th Cir. 2013) (Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

### B. Abandonment

Warrantless searches or seizures of abandoned property do not violate the Fourth Amendment because people who abandon property have no legal standing to complain of the search and seizure. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). Whether property is abandoned is a question of intent. *Id*. The inquiry into abandonment should "focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." *Id*. Abandonment is determined in light of the totality of the circumstances. *Id*. Two important factors are denial of ownership and physical relinquishment of property. *Id*. Denial of property ownership can demonstrate an intent to abandon the property. *Id*. *But see Lopez-Cruz*, 730 F.3d at 808–09 (defendant did not abandon cell phones he possessed and was using by denying ownership and telling police they belonged to a friend).

Property relinquished by a defendant into plain view during police pursuit can be considered abandoned property. *United States v. McLaughlin*, 525 F.2d 517, 519–20 (9th Cir. 1975) (marijuana thrown from window of fleeing truck onto street during police pursuit was considered plainly visible and, thus, abandoned). However, the simple act of dropping a suitcase

and walking a few steps away before being stopped by police is not considered abandoning property. *United States v. Jackson*, 544 F.2d 407, 410 (9th Cir. 1976).

### III. DISCUSSION

Mr. Jensen moves to suppress "the search and the fruits of the search of the pouch" on May 11, 2022. Dkt. No. 40 at 1. The defense motion only requests suppression of the contents of the pouch and contents found within the cylindrical container that was within the pouch. Dkt. No. 40 at 1-5. The motion does not address the search of Mr. Jensen's Lincoln vehicle. The parties do not dispute that, shortly before his arrest, Mr. Jensen was holding a black pouch while next to Mr. Olsen's driver's side door; that Mr. Jensen was arrested, handcuffed, and placed in the locked cage of a police truck; that, at the time he was arrested, Mr. Jensen was not in possession of the pouch; that an officer recovered the pouch from the inside of Mr. Olsen's vehicle and searched it without a warrant; or that the cylinder within the pouch was searched the following day pursuant to a search warrant.[7] *See* Dkt. No. 40 at 2; Dkt. No. 48 at 3.

In Mr. Jensen's motion, he argues that the police searched his pouch without a warrant and that no exceptions to the warrant requirement—namely, search incident to arrest or exigency—applied. Dkt. No. 40 at 3–4. In response, the Government asserts that no warrant was required, law enforcement was allowed to search the pouch, and Mr. Jensen lacks standing to challenge the search because he had abandoned the pouch. Dkt. No. 48 at 1. Additionally, the Government asserts that even if Mr. Jensen did not abandon the pouch, the good-faith exception precludes suppression of evidence. *Id*. at 7.

//

//

---

[7] The parties do dispute whether anyone other than Mr. Olsen saw Mr. Jensen toss the bag in the car immediately prior to arrest. Whether or not police saw Mr. Jensen toss the pouch into the car does not change the Court's analysis regarding abandonment.

ORDER ON MOTION TO SUPPRESS – 7

### A. Mr. Jensen Had a Privacy Interest in the Pouch

In *United States v. Lopez-Cruz*, the court concluded that Mr. Lopez-Cruz had a reasonable expectation of privacy in two cell phones in his possession, despite declaring they weren't his, because he had been using them and because they were in his car. 730 F.3d at 808–09. Here, unlike Mr. Lopez, Mr. Jensen owned the item in question. Dkt. No. 48-3 at 3; Dkt. No. 51 ¶ 5. Not only did he own the pouch, but he had been seen holding it, and Mr. Olsen told police that Mr. Jensen owned it. *Id*. Mr. Jensen had a privacy interest in the pouch and, therefore, has standing to challenge the search of it. Further, society would find it reasonable to believe that one can expect privacy in their own bag, particularly as the court in *Lopez-Cruz* concluded that Mr. Lopez-Cruz had a privacy interest in phones he did not even own. *See Lopez-Cruz*, 730 F.3d at 808.

### B. Mr. Jensen Did Not Abandon the Pouch

In *United States v. Jackson*, the Court of Appeals reversed as clearly erroneous a district court's finding that Mr. Jackson abandoned his suitcase when he dropped it and began to walk away from it in response to police announcing themselves and requesting to talk to him. 544 F.2d at 410. The *Jackson* case is more analogous to Mr. Jensen's scenario than any case the government cites. Like Mr. Jackson, Mr. Jensen held a bag right before police contact, he set the bag down in response to police arrival, and he was arrested seconds after setting the bag down. Dkt. No. 48-1 at 1–2.

If anything, Mr. Jensen had an even more reasonable expectation of privacy than Mr. Jackson because rather than leaving the bag on the floor of an airport—or here, on the ground outside Mr. Olsen's vehicle–Mr. Jensen put the bag inside the vehicle of a well-known acquaintance. Dkt. No. 48-3 at 3. Mr. Jensen and Mr. Olsen had known each other for multiple years, Mr. Jensen knew Mr. Olsen lived at The Reserve, and Mr. Jensen's phone number was on

a receipt on the dashboard of Mr. Olsen's car. *Id*. This is not the context or behavior of two people who do not plan to see each other again.

One of the main cases the Government cites to support its assertion that Mr. Jensen abandoned the pouch is *United States v. Nordling,* 804 F.2d 1466. But *Nordling* is distinguishable. In that case, Mr. Nordling not only left his bag on an airplane that he reasonably assumed would be flying off to Seattle without him, but he also denied ownership of the bag on numerous occasions. *Id.* at 1468–69. In contrast, Mr. Jensen left the bag at issue here inside the vehicle of someone he knew, and he did not deny ownership of the pouch to police. Dkt. No. 48-3 at 3.

The other primary case that the Government cites to support its assertion that Mr. Jensen abandoned the pouch is *United States v. McLaughlin*, 525 F.2d 517. In *McLaughlin*, the defendant threw a bag of contraband out of the window of a car that was fleeing pursuing police. 525 F.2d at 519–20. It was unreasonable to assume Mr. McLaughlin intended to retrieve the bag in that scenario; thus, the court found that he abandoned it. *Id*. Unlike Mr. McLaughlin, Mr. Jensen left his pouch in a private area, specifically, the vehicle of his acquaintance. Dkt. No. 48-3 at 3. Mr. Jensen's relationship with Mr. Olsen indicated that it was reasonable to believe that Mr. Jensen was hiding, not abandoning, the pouch in Mr. Olsen's vehicle.

The totality of the circumstances is more consistent with Mr. Jensen trying to hide the pouch rather than abandon it. Mr. Jensen left the pouch in the car of an acquaintance. *Id*. He did not toss the pouch away onto public property for anyone to grab, and he did not deny ownership of it. Dkt. No. 48-1 at 2–3. The police do not claim that Mr. Jensen tried to run or walk away from the pouch. And, as previously explained, the facts establishing the relationship between Mr. Jensen and Mr. Olsen support an inference that Mr. Jensen could reasonably expect to retrieve the pouch.

1       Therefore, the Court finds that Mr. Jensen did not abandon the pouch.

2   **C. Suppression of Pouch and Fruit of Pouch**

3       The exclusionary rule encompasses both the direct evidence that was obtained from an illegal search, as well as later evidence discovered as a result of the initial illegal search. *Segura v. United States*, 468 U.S. 796, 804 (1984) (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Mr. Jensen did not abandon the pouch in Mr. Olsen's vehicle, and Sgt. Bennett searched the pouch without a warrant or an exception to the warrant requirement. As a result of the illegal search of the pouch, Sgt. Bennett discovered the locked cylindrical container that had a sticky substance on the outside of it, smelling of heroin. Dkt. No. 48-3 at 3. As such, all contents of the pouch are suppressed, and the contents within the cylindrical container are also suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

**D. The Good-Faith Exception Does Not Apply**

The Government argues that, even if the pouch was not abandoned, the evidence should be admitted under the good-faith exception to the exclusionary rule. Dkt. No. 48 at 7 (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). Under *Leon*, evidence is admissible if police obtained it in "objectively reasonable reliance" on a search warrant they believed in good faith to be valid, even if a reviewing court later invalidates the warrant. *Leon*, 468 897 at 922. Here, the Government contends that the exception applies because police relied in good faith on a warrant in the search of the cylindrical container. Dkt. No. 48 at 8.

The Government's invocation of *Leon* is misplaced. *Leon* provides an exception to the exclusionary rule when a search, though illegal, was conducted in good-faith reliance on a warrant. *Leon*, 468 897 at 922. The Government does not contend that police were acting in good faith in their search of the pouch (and it is undisputed that that search was not conducted in reliance on any warrant). Under Ninth Circuit precedent, when "a search warrant is issued on the

basis of evidence illegally obtained as a result of constitutional errors by the police" the question is not whether police later relied in good faith on that warrant, but "whether the police misconduct that led to discovery of the illegally obtained evidence is itself subject to the good-faith exception." *United States v. Weber*, No. 22-30191, 2024 WL 722558, at *2 (9th Cir. Feb. 22, 2024) (quoting United States v. Artis, 919 F.3d 1123, 1133 (9th Cir. 2019)), *cert. denied*, 145 S. Ct. 155 (2024).

In other words, where police had no good-faith basis for an initial illegal search, there is no good-faith exception to the suppression of its fruits. The government bears the burden of showing that the good-faith exception applies. *Artis*, 919 F.3d at 1134. Here, the Government's response focused solely on the warrant obtained for the search of the cylindrical container. Dkt. No. 48 at 7–8. The Government affirmed at oral argument that it was not asserting that the good-faith exception applies to the search of the pouch. As the good-faith exception does not apply to the search of the pouch, good-faith reliance on the resulting warrant is irrelevant, and the evidence must be suppressed.

## IV.  CONCLUSION

Accordingly, Defendant's Motion to Suppress May 11, 2022 Search of Pouch (Dkt. No. 40) is GRANTED. All evidence found within the black pouch as well as the fruit of the illegal search, which is the heroin found inside of the cylindrical container, is SUPPRESSED.

Dated this 2nd day of September, 2025.

Tana Lin
United States District Judge